FOURNET, Chief Justice
(concurring).
I fully concur in the views expressed by the majority. However, when such diversity of opinion exists with respect to property having the great value of that involved in this case, lending an illusion of merit to the criticism that has been voiced by some of the interested parties, because of my concern for the integrity and the stability of the jurisprudence, I felt it my duty to read the entire record, to make a careful study and analysis of the evidence and the law applicable thereto, and, in order to make clear what might be otherwise confusing to those who will hereafter study this case, to record my findings.
While the record is voluminous — consisting of 8 volumes totalling 1892 pages, with at least another thousand pages to be found *799 in the some 350 exhibits introduced[1] — the facts are very simple. They may be succinctly stated to be that both the plaintiff and the defendants trace their title to a common author — Allan T. Dusenbury[2]— who, at a tax sale in 1908, acquired Sections 38 and 40 in T. 14 S., R. 20 B., and subsequently, by instrument dated March 9, 1910, sought to convey to Albert Phenis 442 acres in Sections 39 and 40;[3] joining, on December 15, 1910, the Truck Farm Land Company,[4] in transferring to the Louisiana Farm Land Company some 14,967 acres, including ALL of Sections 39 and 40 except certain specified lots described in accordance with a plan of survey of the village of Paradis, Louisiana, that are not involved here, and, also, “approximately 440 acres previously sold to Albert Phenis,” under the deed of March 9, 1910.
*801 It is obvious, therefore, that the plaintiff, who deraigns his title from the Louisiana Farm Land Company, established his ownership under the deed of December 15, 1910, to all of Section 40 except that portion previously conveyed to Phenis by the deed of March 9, 1910. The decision in the case therefore resolves itself into a determination of what land in Section 40 is identifiable under the description contained in the March 9, 1910, deed [5] as being thereby transferred to Phenis. If this description sufficiently operates to transfer a right to any identifiable portion of the property in Section 40, the plaintiff’s suit, to this extent, must fail.
It is apt to observe that although the deed of March 9, 1910, purports to convey some 442 acres “more or less” in Sections 39 and 40, there is nothing in the deed itself from which it can be determined just how much of this acreage was located in Section 39 and how much was located in Section' 40. Furthermore, Dusenbury not only had no title to any portion of Section 39, but the description of the land purportedly conveyed in Section 40 is so uncontrovertibly defective it is impossible for anyone reading that description as written to extend the calls therein set out and locate the land on the ground, and no one ever has, for these calls, when followed, do not, as the experts express it, make a “firm description” of any property whatsoever. This was very ably demonstrated in our original majority opinion and requires no further emphasis here.
Actually, Allan T. Dusenbury, who drew up the 1910 deed and prided himself with being a civil engineer, denied he had signed the instrument as recorded, implying a clerk in the recording of the same omitted essential words.[6] He was so emphatic about the defectiveness of the description in the 1910 deed he said: “ * * * my self respect would not allow me to say that I signed such an instrument as that recorded instrument is.” (Tr. 1307-08.) Commenting further, he said that “no one but a nitwit would not know that an error was made” (Tr. 1435) and that “common sense would not allow even a ‘half-wit’ to make errors like that.” [7] (Tr. 1431.)
*803 ' According to Dusenbury, apparently the only living party to the deed of March 9, 1910, “Albert Phenis or somebody connected with his outfit discovered the error that had been made in describing it, and asked to have the correction deed issued; which was about two (2) years after the original deed was executed” (Tr. 1423), explaining, further, that Phenis, in telling him the description as recorded was not correct, stated it “had been brought to his attention, I think by his home office;[8] and he asked me, or somebody in my office, to have a correction deed made” (Tr. 1434) “conveying to him the land that was intended to be conveyed to him in CLEAR terms” (Tr. 1434), and he, accordingly, drew up the Instrument termed “Correction of Title by A. T. Dusenbury to Albert Phenis” that was executed on April 18, 1912. (The emphasis on the word “clear” appears thusly in the record: all other emphasis has been supplied by me.)
The language used in this correction instrument to describe the property Dusen *805 bury and Phenis INTENDED to convey[9] is so clear and unambiguous that when the lines are produced according to the calls the deed sets out a “firm description” that unquestionably describes only Tract No. 2 on the plat in the original majority opinion. The fact that Tract No. 2 contains only about 183.51 acres while the deed as corrected states the property thereby being conveyed contains “442 acres more or less” is immaterial, for, as testified by J. C. De Armas, Jr., one of the two independent experts introduced by defendants, Wherever you have a description that is complete and intelligently describes the property, the ‘acreage clause’ is the weakest point of that description and would have no effect on the interpretation of that description”[10] (Tr. 1282) ; further, “that the acreage would he predicated wholly on the result of the survey of that area” (Tr. 1291-92), that is, a survey made under the description contained in the deed. This is in accord with our jurisprudence.
*807 The defendants, obviously realizing that the 1910 deed as corrected in 1912 was translative of title to Tract No. 2 only, endeavored to skip over this link in their chain of title and sought, throughout, to base their claim to the entire acreage involed in this litigation (Tracts 1, 2, and 3) on the instrument of March 9, 1910, alone, contending that inasmuch as the description therein was ambiguous, they should be permitted to show and to locate by extrinsic evidence the land intended to be conveyed by Dusenbury and Phenis at the time it was drawn and executed.
If such evidence was admissible under this theory, clearly the best evidence of the intention of these parties was the interpretation they themselves gave the 1910 instrument in the correction document executed by them on April 18, 1912, and in which they acknowledged before a notary public that the land intended to be conveyed by the deed of March 9, 1910, was erroneously described, and that it was their desire “by these presents to correct the said error and place the title as far as said correction is concerned of proper record.” They also declared “that the true and correction (correct) description of said property” was as therein stated,[11] and, further, that they “hereby authorize and require the Clerk of Court and ex-officio Recorder in and for the Parish of St. Charles, to note this correction in the margin of Conveyance book * * * wherein the original deed was formerly registered so that property may be correctly and perfectly described.” The parties themselves by this deed thus wiped out of existence the description in the March 9, 1910, deed and substituted therefor the description as set out in the 1912 instrument,[12] and they so declared to the world by their public recordation of it. (The emphasis has been supplied by me.)
However, in my opinion, it is immaterial for a decision in this case whether the deed of 1910 is totally defective, i. e., not translative of title to any portion of Section 40, as contended by the plaintiff, or, as contended by the defendants, only ambiguous, entitling them to prove by extrinsic evidence the actual land intended to be conveyed, for, as pointed out by the author of the majority opinion on rehearing, in the several transfers made of the property *809 prior to the plaintiff's acquisition thereof, there is a specific reference to the fact that there is excepted from the sale of the property in Section 40 that portion previously sold to Phenis. Several of the transfers containing this exception occurred after the execution and recordation of the correction instrument of 1912, and, under our law of registry, the plaintiff was bound by these instruments.
By the same token, the defendants were likewise bound by these instruments, and they cannot, therefore, assert title to any land in Section 40 that is not conveyed to them under the March 9, 1910, deed as corrected in 1912. It necessarily follows that when Manufacturers’ Record acquired its interest direct from Power (a party to this correction deed) on July 23, 1915 (some three years after the correction deed was executed), and under the IDENTICAL language used in the 1912 instrument, it acquired in Section 40 only that property therein specifically described, which is Tract No. 2. It could not, thereafter, convey a greater right to its mineral lessee, the Humble Oil and Refining Company, or to those who acquired through either one or both of these ’ companies, particularly when the Humble léase, granted in 1938, is, according to its very terms, limited to that portion of Section 40 described in the 1912 correction instrument, which is Tract No. 2.

. The major portion of the evidence in the record proved to be wholly unnecessary and irrelevant for a decision in this case. Much of it was devoted to an attempt to establish title by possession of 30 years, which proved to be futile and was abandoned. A large part of the remainder was introduced by defendants, over plaintiffs objection, in an effort to establish their title to Tracts Nos. 1, 2, and 3 by showing the intention of the parties through oral explanation of the deed of 1910, although there was of record an instrument executed by these same parties in 1912 in which that intention was spelled out in clear and unambiguous language.

. Dusenbury was, at the time, the treasurer of the Truck Farm Land Company. This company had, in 1906, acquired from O. W. Crawford, along with other property “A certain plantation known as the ‘Vaelierie’ plantation, composed of sections 39 N. and E. of Bayou Saut D’Ours, also all of Secs. 38 and 40 in T. 14 S.R. 30 E.” Sections 38 and 40 were conveyed to Dusenbury by the sheriff pursuant to a sale provoked to pay the unpaid taxes of 1907 assessed in the name of the Truck Farm Land Company, and, in a document executed on May 27, 1940, Dusenbury stated he “actually purchased said property for and on behalf of the Truck Farm Land Company, Ltd. in his capacity as treasurer of said corporation.” It is to be noted that under this tax deed Dusenbury actually acquired no title whatsoever to any property in Section 39.

. The land sought to be conveyed by this deed is described therein as follows: “That portion of lot or Fractional section 40 lying West of the section line between sections seven (7) and Bight (8) above, produced, and a line drawn West from a point on the center line of the Morgan Louisiana and Texas R. R. Co., said point being 600 feet North of the intersection of said Railroad with Bayou Saut D’Ours.” (The description of the land in Section 39 is not included inasmuch as it is not involved in this litigation.)

. In the deed it is stated that Dusenbury was appearing for the purpose of renouncing, abandoning, relinquishing, transferring and assigning to the Louisiana Farm Land Company “all right, title, and interest which he has, or may have, to any and all of the lands herein conveyed and described.” Another party to the deed was the Louisiana Meadows Company, conveying other property which it owned and which is not included in this litigation. Edward Wisner was the president of both the Truck Farm Land Company and the Louisiana Meadows Company and signed the deed as such. The present plaintiff secured his interest in the property in Section 40 through Wisner.

. This description is set out in Footnote No. 2, supra.

. On the witness stand Dusenbury insisted the essential words omitted from the description, so far as Section 40 is concerned, were “south of,” which should have been inserted between the words “and” and “a” following the phrase “above, produced” (Tr. 1423), so that the description would read thusly: “That portion of lot or Fractional Section 40 lying West of the section line between sections Seven (7) and Bight (8) above, produced, and south of a line drawn West from a point on the center line” of the railroad. The italicized words are those Dusenbury considered sufficient to describe the property in Section 40 he intended to convey to Phenis by the 1910 deed.

.A month and a half after executing the deed of March 9, 1910, Phenis, by deed of April 21, 1910, conveyed the land he purportedly acquired in Section 40 to Ray C. *803 Power, using the IDENTICAL description contained in the March 9, 1910, deed as it appears on the public records, although that deed of March 9, 1910, was not actually recorded until July 13, 1910, several months la ter. It is obvious, therefore, that the original deed of March 9, 1910, could ALONE have been used as the basis for supplying the description carried forward into the PhenisPower deed, and that it, therefore, contained the identical faulty description to be found in the March 9 deed as recorded, Dusenbury’s protestations to the contrary notwithstanding. (The original deed was never produced, and it was stated by the defendants it had been lost or misplaced.) Furthermore, even had there been an omission of the words “south of,” from the description of the land conveyed in Section 40, this recordation was the only instrument on the public records that limited the acreage in Section 40 that Lousiana Farm Land Company acquired under its deed of December 15, 1910, and that was, therefore, binding on the company. That recordation described no identifiable land whatsoever; consequently, there was no legal limitation on the acreage in Section 40 acquired by the company under its 1910 deed of December 15.

. It would appear the error in the description of the property was first noted by Ray O. Power, who went to Phenis for a correction, as these parties, on March 16, 1912, executed what is termed a “Correction of Title by Albert Phenis to Ray C. Power,” wherein the words “south of” are added to the description of the land in Section 40, and the word “lino” is substituted for the word “land” in the description of the land in Section 39, exactly as was done later in the Dusenbury-Phenis correction instrument. In this instrument Phenis and Power recognized that “an error was made in the description of said lands,” and the parish clerk was authorized to note the correction “in the margin of the Book and folio wherein the original deed of sale was registered so that the property may be correctly and perfectly described.” It was not until more than a month later that Phenis went to Dusenbury (apparently because recordation of the correction instrument without the approval of Dusenbury was refused by the officials) for the correction of their deed by the document of April 18, 1912. Dusenbury stated that both of these correction instruments were taken to St. Charles Parish by Phenis, whore they were recorded on April 26, 1912.

. This corrected description, in so far as Section 40 is concerned, reads: “That portion of lot or fractional section 40 lying west of the section line between sections seven and eight above produced and south of a line drawn west from a point on the center line of the Morgan’s Louisiana and Texas Railroad Co., said point being 600 feet north of the intersection of said railroad, with Bayou Saut D’Ours * * It is obvious that the only change made in the description was the addition of the italicized portion. This is the only addition that Dusenbury, who drafted both the original and the corrected instruments, insisted, even up to and during the trial of this case, was all that was needed to describe just exactly the land he intended to convey to Phenis and that Phenis intended to purchase.

. This testimony corroborates fully the two experts testifying on behalf of the plaintiff (Guy Soghers and Earl M. Collier) , as well as another of the defense experts, O. E. Young. The main defense witness, Jack S. Toler — who admittedly was instructed by his superiors in the Humble Oil and Refining Company to confirm a survey made by J. M. Nichols and prepare himself to testify in behalf of Humble in the suit then in progress— although acknowledging that without the acreage call he could not locate any property whatsoever in Section 40 under the description in the 1910 deed, took a view contrary to that of the defense witnesses De Armas and Young, i. e., he stated the acreage call was the all important consideration in the deed. He therefore sought by manipulating a number of tracts he carved from Section 40 to locate some combination of them that would total 442 acres, and, once that combination was ascertained, concluded this was the acreage intended to be conveyed by the 1910 deed. The only other expert testifying on behalf of the defendant (Fred N. Shutts) sought to uphold throughout the views of Toler, whom he followed on the stand and whoso testimony he had just heard. The testimony of Toler and Shutts is not impressive. It is not only contrary to the defendants’ other two experts — De Armas and Young — and that of the plaintiff’s two experts — Segher and Collier, but, like Young’s testimony, it is contradictory in many material aspects and, in other aspects, Toler and Shutts contradict each other. Additionally, Shutts admitted he knew nothing about the property except what he had been told in a conference with Toler and defense counsel.

. This description is given supra in Footnote No. 8.

. Such a notation appears not only on the margin opposite the 1910 Dusenbury-Phenis deed as recorded, but also on the margin of the 1910 Phenis-Power deed as recorded. The notation is not dated, and the handwriting was not identified during the trial, but the present clerk of court testified the notation was not in the usual form officially employed by the recordation officials, though both instruments directed those officials to make such a notation on both original recordings.